IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| COUNTRY LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-0386-CV-W-REL |
| | ) | |
| JOHNO MARKS and DEBBIE MARKS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM TO COUNSEL

Following is the legal authority for the wording of the substantive instructions and interrogatories discussed herein. Interrogatories will be used rather than a standard verdict form for several reasons.

1.      The claim of Johno and Debbie Marks for monetary relief is contained in a counterclaim; however, defense counsel stated during the pretrial conference that he would not present that claim to the jury. Therefore, the award of money would occur should the plaintiff lose, rather than in the usual case where the award of money occurs when the plaintiff wins. This is a confusing set of circumstances for the jury.

2.      Because there are multiple affirmative defenses involving multiple alleged misrepresentations, it would be very difficult to ensure that the jury's verdict is unanimous on not only the claim but on each affirmative defense.

3.      Due to the multiple alleged misrepresentations and the multiple affirmative defenses, the verdict form would be difficult for the jury to understand. Separate interrogatories on each element of each affirmative defense will allow them to deliberate on each separately and make certain that they reach a unanimous decision on each essential element.

The federal court hearing a case based on diversity jurisdiction is not required to use the state's approved jury instructions. The judge is only required to instruct the jury correctly on the appropriate and relevant state law. Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 720-21 (8th Cir. 2008 (reversing in part on other grounds but acknowledging, in action arising from injuries allegedly caused by fireworks, that a federal court presiding over a diversity case is not bound to follow the language contained in a state's uniform jury instruction); Porchia v. Design Equipment Co., 113 F.3d 877, 882-83 (8th Cir. 1997); Kansas City Power & Light Co. v. Ford Motor Credit Co., 995 F.2d 1422, 1429-32 (8th Cir. 1993); Bersett v. K-Mart Corp., 869 F.2d 1131, 1134-35 (8th Cir. 1989); Scott v. Conroy, 577 F.2d 13, 16 (8th Cir. 1978).

As the sort of benefactor-type relationship between Romig and the Markses has not been the subject of a prior Missouri case, Country Life Insurance Co. v. Marks, 592 F.3d 896, 900 (8th Cir. 2010), the instruction listed below as well as the first interrogatory have been constructed using my prediction what the Missouri courts would hold were the question presented to them. Percival v. General Motors Corp., 539 F.2d 1126, 1130 (8th Cir. 1976).

INSTRUCTION NO. _____

A person cannot take out a valid and enforceable policy of insurance for his own benefit on the life of a person in which he has no insurable interest; such a policy or contract of insurance is void and unenforceable on the grounds of public policy, it being merely a wagering contract. For one to have an insurable interest in the life of another, there must be a reasonable ground founded upon the relations of the parties to each other, either pecuniary or of blood or marriage, to expect some benefit from or advantage from the continuance of the life of the insured. The parties agree in this case that Johno and Debbie Marks were not related to Connie Romig by blood or marriage.
    To have an insurable interest under the pecuniary benefit classification, one must ask whether the beneficiary would regard himself as better off from the standpoint of money, would he enjoy more substantial economic returns should the insured continue to live; or would he have more, in the form of the proceeds of the policy should the insured die. If the beneficiary would profit by the insured's death, the policy contract is void since the public has a controlling concern that no person have an interest that may give rise to a temptation to destroy the insured's life. Therefore, when the disproportion between the insurance and the pecuniary benefit that the

2

> beneficiary reasonably could have expected had the insured lived, is so great, taken with the other circumstances of the case, as to show a want of good faith in the beneficiary, the policy will be deemed a wager contract, and void.

Lakin v. Postal Life & Cas. Ins. Co., 316 S.W.2d 542, 549 (Mo. 1958)
Drane v. Jefferson Standard Life Insurance Co., 161 S.W.2d 1057, 1059 (Tex. 1942), cited by
    Country Life Insurance Co. v. Marks, 592 F.3d 386 (8th Cir. 2010)

*Interrogatory Number 1*

Does the difference between the amount of insurance Johno and Debbie Marks expected to receive from the Country Life policy and the amount Johno and Debbie Marks reasonably could have expected to receive had Connie Romig not died, taken with the other circumstances of the case, show a lack of insurable interest and deem the policy a wager on Connie Romig's life?

If you answered "YES" to question 1, go to the end of this form and have your Jury Foreperson sign and date; your have completed your deliberations.  If you answered "NO" to question 1, go to question 2.

Country Life has proposed the following instruction to which Johno and Debbie Marks object.  "On the claim of Johno and Debbie Marks against Country Life, your verdict must be for Johno and Debbie Marks, if you believe that, at the time Connie Romig applied for the Country Life policy, Johno and Debbie Marks reasonably expected to receive **a greater pecuniary benefit or advantage from the continued life of Connie Romig than the amount of the death benefits they could have expected to receive** under the Country Life policy, in the event of her death." (emphasis added).  Hence, Country Life's position is that the comparison is between

| What the beneficiaries reasonably could have expected to receive financially had Romig lived | v. | How much life insurance they expected to receive upon her death |
|---|---|---|

The Markses' interpretation of the law is that any reasonably expected pecuniary benefit from the continued life of the insured is enough to make the policy valid.  Therefore, Johno and Debbie Marks believe that the comparison is between

| What the beneficiaries reasonably could have expected to receive financially had Romig lived | v. | The end of those pecuniary benefits due to Romig's death |
|---|---|---|

Under Country Life's interpretation, a comparison must be made between what the beneficiaries would get financially if (1) the insured continues to live and provide the financial assistance he or she has been providing in the past versus (2) the amount of the life insurance policy. If the amount of the life insurance is greater, then the policy is void. Under the Markses' interpretation, if the jury finds that Johno and Debbie Marks received ANY financial assistance from the insured and they have a reasonable expectation that the financial assistance would have continued had the insured not died, then the policy is valid and no further comparison is needed.

The legal analysis begins with the Eighth Circuit's opinion in this case; and although there is no Missouri case on point, other Missouri cases dealing with insurable interests are helpful. The Eighth Circuit's earlier opinion in this case, Country Life Insurance Co. v. Marks, 592 F.3d 896 (8th Cir. 2010), does not answer the question at issue here.

Because the Markses were both beneficiaries and owners of the Country Life policy, they had to prove they had an insurable interest in the life of the insured, otherwise the policy would be unenforceable. See Lakin v. Postal Life & Cas. Ins. Co., 316 S.W.2d 542, 550, 552 (Mo.1958). To establish an insurable interest under Missouri law, a party is required to show a benefit or advantage from the continuance of the life of the insured. Id. at 549. An insurable interest can be based upon three different types of relationships -- a pecuniary relationship, a blood relationship, or a relationship based upon affinity (i.e., marriage). Id.

The Markses did not have a blood or marriage relationship with Romig, so the existence of an insurable interest turned instead upon whether there was a pecuniary relationship between them. To establish an insurable interest based upon a pecuniary relationship, "there must be 'a reasonable probability that [the beneficiary] will gain by the [insured's] remaining alive or lose by [her] death.' " Hershberger v. Young, 59 S.W.3d 614, 622 (Mo. Ct. App. 2001) (quoting Poland v. Fisher's Estate, 329 S.W.2d 768, 772 (Mo.1959)). "Stated another way, 'any reasonable expectation of pecuniary benefit or advantage from the continued life of another creates an insurable interest in such life.' " Id. at 622-23 (quoting Alexander v. Griffith Brokerage Co., 228 Mo. App. 773, 73 S.W.2d 418, 423 (1934)). Whether a party has an insurable interest due to a pecuniary interest is a question of fact when the parties dispute (as they do here) the

basis for the pecuniary interest.  See Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1078 (8th Cir. 1980) (applying Missouri law).

* * * * *

Although the sort of benefactor-type relationship between Romig and the Markses has not been the subject of a prior Missouri case, other jurisdictions which follow the same common law rules as Missouri have recognized an insurable interest under analogous facts (discussed below).  Thus, if the relationship between them satisfies the general test for creating an insurable interest (i.e., any reasonable expectation of pecuniary benefit or advantage from the continued life of another), we conclude Missouri courts would recognize it.

Id. at 899-900.

The Eighth Circuit discussed two Texas cases and one Pennsylvania case:  Drane v. Jefferson Standard Life Ins. Co., 139 Tex. 101, 161 S.W.2d 1057 (1942);  Reed v. Smith, 120 S.W.2d 302 (Tex. Civ. App.1938); and Clayton v. Industrial Life Ins. Co., 162 Pa. Super. 77, 56 A.2d 292 (1948).

Drane involved two life insurance policies totaling $10,510.  The insured owned the policies and she named a minor as beneficiary. The minor was 17 at the time of the insured's death.  He was born in her home, lived with her for almost three and a half years while his mother was ill, went on vacation with the insured.  The insured bought his necessities, took him to daily doctor appointments, paid his medical bills, paid a charge that he had with which he could buy "what he wanted."  The court found that, "It is inconceivable, under the facts of this record, that he would ever have been tempted to destroy her life in order to collect the proceeds of the two policies in suit" and therefore he had an insurable interest.  Although the court in Drane did not explicitly compare the dollar figures, the facts of the case clearly show a benefit from the continued life of the insured versus the $10,510 the beneficiary would have received upon the insured's death, and the court explicitly found that considering the expected continued pecuniary benefit, the beneficiary would never have been tempted to destroy her life "in order to collect the proceeds of the two policies".  This can only mean that the court was

5

comparing the continued financial benefits versus the amount of the life insurance policy.

Reed v. Smith, 120 S.W.2d 302 (Tex. Civ. App. 1938), involved the following facts: Frank Reed married Effie Pearl Reed in 1923. Effie had a daughter, Willis Smith. In 1934 Frank Reed took out a $1,000 life insurance policy naming his wife as beneficiary. In August 1936 -- the month before his divorce from Effie was final -- Frank Reed changed the beneficiary to his stepdaughter, Willis Smith even though when the divorce was final, Willis Smith was no longer Frank Reed's step daughter. Two months after his divorce from Effie, Frank married Ollie Reed. Twenty-five days later, Frank died. In a jury trial, the issue was whether Willis Smith, the former step daughter of the insured, had an insurable interest in his life. In affirming the jury verdict finding that she DID have an insurable interest in her former step father's life, the court said,

> Willis Ralph Smith lived with [the insured] for approximately ten years. After her marriage she resided a part of the time at his home and her daughter was born there. She often visited him and he returned the visits to her home regularly. To others he constantly referred to her as his daughter and always referred to her child as his granddaughter. His affection for them is not to be doubted. When the child was born he paid the hospital, doctors and medical bills. He commonly bought clothes for the appellee and her daughter. He advanced money to enable the appellee and her disabled husband to engage in business. To his friends he expressed a desire that she be notified in case of his death or injury at any time. He delivered the key to his lock box to a friend with instructions that any effects left after his death be delivered to appellee. He not only made her the beneficiary in the policy, but otherwise expressed a desire that she have the proceeds of the same. In a letter he stated that he would use the funds, of which he was hopeful of recovering as back wages from his employer, with which to buy her an automobile. He gave her a radio and wrote her a letter agreeing, or stating his purpose to pay her $10 per month for her support, and expressed his intention to give her everything he had in the event of his death. He stated he expected to see after her while her husband was disabled and that it was his purpose to see that [her] child was educated.

Once again, the court did not specifically compare this expected continued pecuniary benefit with the $1,000 life insurance proceeds, but both facts were in the opinion.

Clayton v. Industrial Life Ins. Co., 162 Pa. Super. 77, 56 A.2d 292 (1948), involved the following facts. Prior to 1914 and until 1934, the insured resided with the plaintiff (his niece),

6

her husband, and their children.  The insured disappeared in 1934, was not heard from thereafter, and his death was proved by seven years' unexplained absence.  The policy on the life of her uncle was issued to the plaintiff on March 2, 1914, and she paid the premiums thereon until May 3, 1946 (32 years total, and for 12 years after his disappearance).  Prior to the issuance of the policy in 1914, the niece's husband was required to work at night and, after someone tried to break into their house while the husband was at his work, the uncle was asked to come over during the evenings as company for his niece and her children.  Later on he was asked to live with them, which he did "as one of the family" until his disappearance twenty years later.  During that time the uncle "would do anything he could to help" the niece and her family.  He did chores about the house and assisted in the raising of the children, looking after them and preparing their meals when the niece was not there.  He took care of the fires, cleaned the snow from the sidewalk, ran errands, and was a companion and protection in the evenings.  Because of the assistance given by him, the plaintiff was able to go and earn money, but after the insured's disappearance it was impossible for her to continue to work and in addition she lost the assistance of her uncle in the many services around the house which he had performed during his lifetime.  The court found that if the uncle over a period of twenty years furnished money to his niece to enable her to employ a companion for her and her children while her husband was at his nighttime job, a maid to help with the housework, a handyman to shovel snow, keep the fires burning, and do odd chores around the house, a nanny to stay with the children so that the plaintiff could work -- or one person to perform all these services -- "it could not be contended that she did not have a 'lawful economic interest' in the continuance of her uncle's life.  Here instead of furnishing the money for these services, he himself performed them."

This case not only did not compare the expected pecuniary benefit, it did not even mention the amount of the life insurance policy at issue.

Because these three cases cited by the Eighth Circuit are all three different in respect to either comparing the expected financial benefit from the life of the insured versus the amount of the life insurance policy or merely finding a more-than-de-minimis financial advantage during the life of the insured, additional research and analysis is required.

The Eighth Circuit indicated that Missouri uses common law rules with respect to insurable interest questions. 592 F.3d at 900. According to common law, the beneficiary must have an insurable interest in the life of the insured, and the insured must consent to his or her life being insured by the beneficiary.

> In the early common law, there was no requirement that the owner of a life insurance policy have an insurable interest in the life of the insured, nor was there any requirement that the insured consent to the coverage on his life. The statutory requirement of insurable interest was intended to prevent wagering on human lives. The insurable interest requirement is inbred with a potential conflict of interest when one with an insurable interest obtains coverage on the insured without the insured's consent. The conflict is that the beneficiary of the policy has both an interest in the insured's continued life (the insurable interest) and an interest in the insured's death (as beneficiary of the policy). . . . [T]his conflict might be a fruitful source of crime. At the very least, it creates a substantial risk to the unknowing insured person.

> As in other cases of conflict of interest, the consent of the party who would be affected by the conflict of interest obviates the public concern since the affected party can best evaluate the risk to his own interest. In the context of life insurance, it was recognized early in our jurisprudence that it is against public policy to procure insurance on the life of another without his consent, even though the insurance was procured by one having an insurable interest. . . ." Hopkins v. Hopkins, 328 Md. 263, 271-72, 614 A.2d 96, 100 (Md. 1992), quoting Wood v. New York Life Insurance Co., 255 Ga. 300, 336 S.E.2d 806, 809 (1985), quoting Connecticut General Life Insurance Co. v. Wood, 631 F. Supp. 9 12-13 (N.D. Ga. 1984). The policy thus stems from the perceived need "to avoid extending to the beneficiary the temptation to hasten by improper means the time when he will receive the benefits of the policy." Id. The Supreme Court of South Carolina stated:

>> The rule against insuring policies on the life of a person without his knowledge or consent is "designed to protect human life." Policies issued in violation of this rule "are not dangerous because they are illegal: they are illegal because they are dangerous."

Ramey v. Carolina Life Insurance Co., 224 S.C. 16, 135 S.E.2d 362, 366-67 (S.C. 1964).

In this case it is undisputed that Connie Romig consented to having her life insured by the Markses.

At common law, those held to have an insurable interest in the life of another were traditionally grouped into three general classes:  (1) one so closely related by blood or affinity that he wants the other to continue to live, irrespective of monetary considerations; (2) a creditor; and (3) one having a reasonable expectation of pecuniary benefit or advantage from the continued life of another.  Drane v. Jefferson Standard Life Ins. Co., 139 Tex. 101, 104, 161 S.W.2d 1057, 1058–59 (1942).  Common law prohibited anyone other than one with an insurable interest from insuring another person's life.  The primary purpose of the prohibition is to prevent wagering on the life of another, which includes the prevention of murder. Hopkins v. Hopkins, 328 Md. 263, 268 614 A.2d 96, 98 (1992); Edwin W. Patterson, Essentials of Insurance Law § 34, at 158 (1957).

The Texas Supreme Court in Drane v. Jefferson Standard Life Insurance Co., 139 Tex. 101, 161 S.W.2d 1057, 1059 (Tex. 1942), (cited by the Eighth Circuit in the earlier Marks opinion) stated:  "Bluntly expressed, insurable interest under [the pecuniary benefit] classification, is determined by monetary considerations, viewed from the standpoint of the beneficiary.  Would he regard himself as better off from the standpoint of money, would he enjoy more substantial economic returns should the insured continue to live; or would he have more, *in the form of the proceeds of the policy* should he die." (emphasis added).  If the beneficiary "would profit by [the insured's] death, the policy contract is void as to [the beneficiary] since the public has a controlling concern that no person have an interest that may give rise to a temptation to destroy [the insured's] life." Id.

In <u>Lakin v. Postal Life and Casualty Insurance Co.</u>, 316 S.W.2d 542 (Mo. 1958), the

Court held:

> It has uniformly been held that a person cannot take out a valid and enforceable policy of insurance for his own benefit on the life of a person in which he has no insurable interest; such a policy or contract of insurance is void and unenforceable on the grounds of public policy, it being merely a wagering contract. . . . It has repeatedly been stated that for one to have an insurable interest in the life of another, there must be a reasonable ground founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, *to expect some benefit from or advantage from the continuance of the life of the insured.*

<u>Id</u>. at 549 (emphasis added).

The cases discussed above seem to encourage a comparison between the benefit or advantage from the continued life of the insured versus the financial advantage to the beneficiary of the insured's death, i.e., the amount of the life insurance policy.

Although the issue in this case does not involve life insurance obtained by a creditor of the insured, because there is no case in Missouri on point, we must look to the Missouri courts' opinions in a broader context. The Court in <u>Lakin v. Postal Life and Casualty Insurance Co.</u>, 316 S.W.2d 542 (Mo. 1958), was faced with a life insurance policy taken out by a man who claimed to be a partner of the insured and who had advanced money to the insured thereby making him a creditor. The Court first held that there was no evidence of a partnership between the insured and the beneficiary. The Court noted that if there had been money advanced to the insured by the beneficiary, the amount would have been small given the short time period the two worked together:

> It is well settled that to allow the creditor to procure insurance greatly exceeding the amount of the debt might be to tempt him to bring the debtor's life to an unnatural end, and thus contravene the principle of public policy which has been seen to lie at the very basis of the doctrine of insurable interest, and the only practical working rule would seem to be that *when the disproportion between the insurance and the debt is so great, taken with the other circumstances of the case, as to show a want of good faith in the creditor, the policy will be deemed a wager contract, and void.*

<u>Id</u>. at 551 (emphasis added).

From this holding, it appears that the Missouri courts do believe that the comparison should be made between the amount of the insurance policy and the financial benefit to the beneficiary in the event the insured had continued to live. I do not believe, however, that this means the jury must find that if the pecuniary benefit would have been $700,000 and the policy $1,000,000, the policy was void, as suggested by Johno and Debbie Marks. It appears that the important factor here is the proportion, not the exact dollar amount. And this is but one factor to consider, hence the clause "taken with the other circumstances of the case".

Johno and Debbie Marks rely on multiple cases which I find are not on point. O'Donnell v. MFA Insurance Co., 671 S.W.2d 302 (Mo. App. 1984), involved a couple who had insurance on their house, and they contracted with someone to build them a new house for $21,000 plus a trade of their current house. They signed the house over to the builder and then rented it back from him while the new house was being built. While they were renting, the house was destroyed by fire. The validity of the insurance policy ($7,000 for the structure and $3,000 for the contents) was litigated and the court found that the couple had an insurable interest in the house because they lived in it and the policy did not say that only the house's owner could be the beneficiary. Because this case did not involve life insurance, it is wholly inapplicable.

In Butterworth v. Mississippi Valley Trust Co., 362 Mo. 133, 240 S.W.2d 676, 680 (Mo. 1951), Butterworth took out a life insurance policy and named as beneficiary "G. Locke Tarlton, Creditor of the Insured." Tarlton and Butterworth were business partners for 20 years and each owned 1/4 interest in their company. Tarlton died a few years before Butterworth. Butterworth purchased Tarlton's share of the business and paid Tarlton's estate $42,320 "to clean up all business relations between the two men." Butterworth did not claim an interest in the life insurance policy, and when he died, Tarlton's widow received the proceeds through

Tarlton's trust.  The Court held that, "It is uniformly held that a creditor has an insurable

interest in the life of his debtor."  However, in addition to this finding, the court said that:

> The business relationships of the two men were interlocked and intertwined and this
> record shows that for their mutual prosperity, they were mutually dependent upon
> each other. . . .  The business relationships of the two, their dependency upon each
> other, gave Tarlton a full insurable interest in the life of Butterworth. Generally, any
> reasonable expectation of pecuniary benefit to one person from the continued life of
> another creates an insurable interest.

The Markses cite only that last sentence, i.e., that "any reasonable expectation of

pecuniary benefit to one person from the continued life of another creates an insurable

interest."  However, read in context, it does not mean that "any pecuniary benefit" at all from

one person to another creates an insurable interest in that person's life.  Indeed, even the

Markses conceded on appeal that the pecuniary interest must be more than de minimis, which

seems to contradict their reading of this case.  The <u>Butterworth</u> case dealt with business

partners.  At the time the insurance contract was entered into, the two men were business

partners who relied on each other for their mutual prosperity.  Because the insurance contract

naming Tarlton beneficiary of Butterworth's life was valid at the time it was made, it did not

thereafter become invalid because those circumstances changed (i.e., when Tarlton died and

the business partnership ceased to exist).  <u>Kearbey v. Reliable Life Insurance Co. of Webster</u>

<u>Groves</u>, 526 S.W.2d 866, 868 n.2 (Mo. App. 1975) ("The general rule is that 'a policy of life

insurance, or a designation of beneficiary, valid in its inception, remains so, although the

insurable interest, or relationship of the beneficiary, has ceased, unless it is otherwise

stipulated in the contract.'").  The holding of the <u>Butterworth</u> case, because it deals with a

business partnership that ceased to exist, is not really on point.

In <u>Connecticut Mut. Life Ins. Co. v. Schaefer</u>, 94 U.S. 457 (1976), a wife was the

beneficiary of her husband's life insurance policy, they divorced, the husband died, and the

former wife tried to collect on the policy.  The Court was faced only with whether the policy,

which was clearly valid at its inception with the husband being the insured and his wife being the beneficiary, would subsequently become invalid by their divorce. The Court held that if a policy is valid at its inception, it remains so even though the insurable interest later ceases. Interestingly, the Court mentioned the dilemma of what is required to separate a mere wager from a valid life insurance contract, citing Connecticut Mut. Life Ins. Co. v. Schaefer, 94 U.S. 457, 460-61 (1876):

> [P]recisely what interest is necessary, in order to take a policy out of the category of mere wager, has been the subject of much discussion. . . . The essential thing is, that the policy shall be obtained in good faith, and not for the purpose of speculating upon the hazard of a life in which the insured has no interest. On this point, the remarks of Chief Justice Shaw, in a case which arose in Connecticut (in which State the present policy originated), seem to us characterized by great good sense. He says:
>
> > All, therefore, which it seems necessary to show, in order to take the case out of the objection of being a wager policy, is, that the insured has some interest in the cestui que vie[1]; that his temporal affairs, his just hopes and well-grounded expectations of support, of patronage, and advantage in life, will be impaired; so that the real purpose is not a wager, but to secure such advantages, supposed to depend on the life of another; such, we suppose, would be sufficient to prevent it from being regarded as a mere wager.

Loomis v. Eagle Life Insurance Co., 6 Gray, 399 (1856).

Therefore, the "great good sense" as articulated by the Supreme Court of the United States favors an interpretation requiring that the main focus of life insurance be to secure the financial advantages enjoyed during the insured's life rather than a wager, i.e., a significantly higher payoff from the insured's death compared to the financial advantages enjoyed during the insured's life. To me, that suggests a comparison be made between the benefits during life and the amount of the insurance policy. That is, if the proportion is too great, it will be considered a wager, whereas if the proportion is reasonable, it will be considered a replacement for the financial benefits enjoyed by the beneficiary during the life of the insured.

---

[1]The person on whose life an insurance policy is written.

Johno and Debbie Marks also raise the following issues regarding Country Life's proposed Instruction No. 17:

1.       It would result in needing a hearing in every life insurance claim to decide whether the death benefit provided by the policy is greater than or less than the pecuniary loss suffered by the beneficiary.

2.       If the jury found that the expected pecuniary loss was $700,000 and the insurance policy was $1,000,000, then does the beneficiary get the $700,000?

3.       If the jury found that the expected pecuniary loss was $700,000, is the insurance company responsible for refunding the difference in the premium that was charged for the million dollar policy and one they would have charged for a $700,000 policy?

These questions are easily answered. No hearing is required on this comparison because it is a jury question -- this is the purpose of the trial. Indeed, the Eighth Circuit in its earlier opinion in this case indicated that this a jury question. In addition, on appeal the Markses conceded that their pecuniary interest must be more than de minimis. What is more than de minimis is the same type of question and does not require a pretrial hearing.

The beneficiaries would never be awarded an amount other than the original value of the life insurance policy -- either the policy is found to be valid or it is found to be void.

As far as the requirement that the insurance company refund the premium, in this case the insurance company has already refunded the entire premium, so this issue is not really a "controversy" in this case. However, because the common law says the policy is VOID if not valid, it makes sense that if the policy is void the entire premium would be refunded.

If the jury answers "YES" to this question, they have found that the policy is void. Therefore, the issue of misrepresentation is moot. Therefore, the jury is directed to end deliberations if they find that the policy is void.

14

*Interrogatory Number 2*

Did Connie Romig represent in the application for life insurance with Country Life that she had not been diagnosed with and/or received treatment for diabetes in the last ten years?

YES                                    NO

____                                  ____

If you answered "YES" to question 2, go to question 3. If you answered "NO" to question 2, go to question 9.

This interrogatory is taken from MAI 32.19 and represents the first element of the claim. If the jury finds that Connie Romig did not represent that she had not been diagnosed with or received treatment for diabetes in the last ten years, the jury is directed to advance to the questions dealing with high blood pressure.

*Interrogatory Number 3*

Was the representation that Connie Romig had not been diagnosed with and/or received treatment for diabetes in the last ten years false?

YES                                    NO

____                                  ____

If you answered "YES" to question 3, go to question 4. If you answered "NO" to question 3, go to question 9.

This interrogatory is taken from MAI 32.19 and represents the third element of the claim. If the jury finds that Connie Romig had not been diagnosed with and/or treated for diabetes in the last ten years, then the jury is directed to advance to the questions dealing with high blood pressure.

*Interrogatory Number 4*

Did Connie Romig intend that Country Life rely on the representation (that she had not been diagnosed with or received treatment for diabetes in the last ten years) in issuing the policy?

YES                                    NO

____                                  ____

This interrogatory is taken from MAI 32.19 and represents the second element of the claim.

<em>Interrogatory Number 5</em>

Did Connie Romig either know that the representation (that she had not been diagnosed with or received treatment for diabetes in the last ten years) was false or not know whether the representation was true or false?

YES        NO
___         ___

This interrogatory is taken from MAI 32.19 and represents the fourth element of the claim.

<em>Interrogatory Number 6</em>

Did Country Life rely on the representation (that Connie Romig had not been diagnosed with and/or received treatment for diabetes in the last ten years) in issuing the policy?

YES        NO
___         ___

This interrogatory is taken from MAI 32.19 and represents the fifth element of the claim.

<em>Interrogatory Number 7</em>

Did diabetes contribute to Connie Romig's death?

YES        NO
___         ___

This interrogatory is taken from MAI 32.19 and represents the sixth element of the claim.

<em>Interrogatory Number 8</em>

At the time Connie Romig applied for the Country Life insurance policy, did Connie Romig's answers, as a whole, provide sufficient information to put Country Life upon

inquiry such that if Country Life had inquired, Country Life would have learned the truth concerning the nature of Connie Romig's condition with respect to diabetes over the preceding ten years?

YES                                    NO
———                                    ———

This interrogatory consists of a waiver defense, an instruction for which was given in Winger v. General Am. Life Ins. Co., 345 S.W.2d 170, 184-85 (Mo. 1961). In that case, the Court held that "actual notice often means knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain the ultimate fact" citing Shaw v. Butterworth, 327 Mo. 622, 38 S.W.2d 57, 62 (Mo. 1931). In order for this interrogatory to be included, Johno and Debbie Marks must present evidence of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain the ultimate fact. In other words, this interrogatory will not be included unless there is evidence of some reason for Country Life to have questioned whether Connie Romig's representation was really true.

In Winger v. General Am. Life Ins. Co., the insured committed suicide two days after his life insurance policy was delivered. The decedent's application for life insurance included a representation that he had never had a mental disorder. It asked whether he had ever been a patient in a hospital, and he answered that he had. He was asked if he had consulted a doctor in the past five years, and he disclosed that he had been treated by Dr. Louis Forman for nervousness and Dr. A. Shifrin for a routine checkup. He indicated his treatment was earlier that year and lasted for three weeks. Before the insurance policy was delivered, the insured was in the hospital for a "nervous breakdown" and the insured gave permission for his doctor to be interviewed with regard to the life insurance policy. The doctor said the insured was suffering from "nervous exhaustion" and needed a rest but was "physically sound." Under the

circumstances, the court held that it was proper to give the jury the instruction dealing with waiver.

In Guenther v. Metropolitan Life Ins. Co., 189 S.W.2d 126 (Mo. App. 1945), the decedent was asked by the insurance agent, "Did you ever get treated by any physician," and she said, "Yes, by—for stomach trouble." She said Dr. Goldman was the physician at the time. The agent and supervisor both stated, "Oh, that wouldn't amount to anything because we always seen you down stairs in the basement every Monday morning doing heavy washing, well, that won't be necessary to have a doctor's examination." The insured had been treated for a duodenal ulcer which is what caused her death. The court held that there was no waiver, because saying that one was treated for stomach trouble would not impart to the insurance company either directly or by inference the true condition of her health.

> The human being is indeed fortunate who escapes what is probably the most common of complaints -- stomach trouble. It may be caused by a mere indiscretion in eating or drinking, and is ordinarily only a temporary disturbance, and one the family doctor may relieve by prescribing some simple remedy. Fore a strong, healthy appearing woman, capable of doing heavy washing, to say to an insurance agent that she has had treatment for stomach trouble would not impart knowledge, nor carry an inference, that she was afflicted with a serious malady such as a duodenal ulcer. . . .

Id. at 128.

In Brummer v. National Life & Acc. Ins. Co., 59 S.W.2d 781 (Mo. .App. 1933), the insured informed the insurance company's medical examiner of an abscess in her back for which she had undergone an operation. She pointed out the location of the wound, advised him of the name of the doctor who had performed the operation, the length of time she had been in the hospital, and of her going back at intervals for subsequent treatments. She had a rubber drain in the wound at th time of her examination, and the medical examiner had visited her while she was in the hospital. She had been "good and strong", walking two miles each way to the hospital for her treatments and taking care of her five children. On the day of

her death, she walked two miles to the hospital and died during treatment. The insurance company denied payment on the ground that the insured was not in good health at the time the policy was issued. The court held that the insured gave the medical examiner enough information to cover lung trouble as that term was used in the application, or at least put him upon full inquiry.

These cases establish the extent to which Country Life must have been put on notice in order for this waiver interrogatory to be given to the jury.

*Interrogatory Number 9*

Did Connie Romig represent in the application for life insurance with Country Life that she had not been diagnosed with and/or received treatment for high blood pressure in the last ten years?

YES                                    NO

———                                    ———

If you answered "YES" to question 9, go to question 10. If you answered "NO" to question 9, go to question 16.

This interrogatory is taken from MAI 32.19 and represents the first element of the claim. If the jury finds that Connie Romig did not represent that she had not been diagnosed with or received treatment for high blood pressure in the last ten years, the jury is directed to advance to the questions dealing with diseases of the respiratory system.

*Interrogatory Number 10*

Was the representation that Connie Romig had not been diagnosed with and/or received treatment for high blood pressure in the last ten years false?

YES                                    NO

———                                    ———

If you answered "YES" to question 10, go to question 11. If you answered "NO" to question 10, go to question 16.

This interrogatory is taken from MAI 32.19 and represents the third element of the claim. If the jury finds that Connie Romig had not been diagnosed with and/or treated for

high blood pressure in the last ten years, then the jury is directed to advance to the questions dealing with diseases of the respiratory system.

*Interrogatory Number 11*

Did Connie Romig intend that Country Life rely on the representation (that she had not been diagnosed with or received treatment for high blood pressure in the last ten years) in issuing the policy?

YES                              NO

―――                            ―――

This interrogatory is taken from MAI 32.19 and represents the second element of the claim.

*Interrogatory Number 12*

Did Connie Romig either know that the representation (that she had not been diagnosed with or received treatment for high blood pressure in the last ten years) was false or not know whether the representation was true or false?

YES                              NO

―――                            ―――

This interrogatory is taken from MAI 32.19 and represents the fourth element of the claim.

*Interrogatory Number 13*

Did Country Life rely on the representation (that Connie Romig had not been diagnosed with and/or received treatment for high blood pressure in the last ten years) in issuing the policy?

YES                              NO

―――                            ―――

This interrogatory is taken from MAI 32.19 and represents the fifth element of the claim.

*Interrogatory Number 14*

Did high blood pressure contribute to Connie Romig's death?

YES                                             NO
——                                             ——

This interrogatory is taken from MAI 32.19 and represents the sixth element of the

claim.

*Interrogatory Number 15*

At the time Connie Romig applied for the Country Life insurance policy, did Connie
Romig's answers, as a whole, provide sufficient information to put Country Life upon
inquiry such that if Country Life had inquired, Country Life would have learned the
truth concerning the nature of Connie Romig's condition with respect to high blood
pressure over the preceding ten years?

YES                                             NO
——                                             ——

This interrogatory will not be given absent sufficient evidence of waiver, as discussed

above for Interrogatory Number 8.

*Interrogatory Number 16*

Did Connie Romig represent in the application with life insurance with Country Life that
she had not been diagnosed with and/or received treatment for diseases of the
respiratory system in the last ten years?

YES                                             NO
——                                             ——

If you answered "YES" to question 16, go to question 17. If you answered "NO" to
question 16, go to the end of this form and have your Jury Foreperson sign and date.
You have completed your deliberations.

This interrogatory is taken from MAI 32.19 and represents the first element of the

claim.  If the jury finds that Connie Romig did not represent that she had not been diagnosed

with or received treatment for diseases of the respiratory system in the last ten years, the jury is

directed to sign and date the form as they have completed their deliberations.

*Interrogatory Number 17*

Was the representation that Connie Romig had not been diagnosed with and/or received treatment for diseases of the respiratory system in the last ten years false?

YES        NO

——        ——

If you answered "YES" to question 17, go to question 18.  If you answered "NO" to question 17,  go to the end of this form and have your Jury Foreperson sign and date. You have completed your deliberations.

This interrogatory is taken from MAI 32.19 and represents the third element of the claim.   If the jury finds that Connie Romig had not been diagnosed with and/or treated for diseases of the respiratory system in the last ten years, then the jury is directed to sign and date the form as they have completed their deliberations.

*Interrogatory Number 18*

Did Connie Romig intend that Country Life rely on the representation (that she had not been diagnosed with or received treatment for diseases of the respiratory system in the last ten years) in issuing the policy?

YES        NO

——        ——

This interrogatory is taken from MAI 32.19 and represents the second element of the claim.

*Interrogatory Number 19*

Did Connie Romig either know that the representation (that she had not been diagnosed with or received treatment for diseases of the respiratory system in the last ten years) was false or not know whether the representation was true or false?

YES        NO

——        ——

This interrogatory is taken from MAI 32.19 and represents the fourth element of the claim.

*Interrogatory Number 20*

Did Country Life rely on the representation (that Connie Romig had not been diagnosed with and/or received treatment for diseases of the respiratory system in the last ten years) in issuing the policy?

YES                                NO
___                                ___

This interrogatory is taken from MAI 32.19 and represents the fifth element of the claim.

*Interrogatory Number 21*

Did a disease of the respiratory system contribute to Connie Romig's death?

YES                                NO
___                                ___

This interrogatory is taken from MAI 32.19 and represents the sixth element of the claim.

*Interrogatory Number 22*

At the time Connie Romig applied for the Country Life insurance policy, did Connie Romig's answers, as a whole, provide sufficient information to put Country Life upon inquiry such that if Country Life had inquired, Country Life would have learned the truth concerning the nature of Connie Romig's condition with respect to diseases of the respiratory system over the preceding ten years?

YES                                NO
___                                ___

This interrogatory will not be given absent sufficient evidence of waiver, as discussed above for Interrogatory Number 8.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 14, 2011